KAREN INFANTE ALLEN
TRUMBULL CO CLERK OF COURTS
2021 CV 00320 WWM
FILED: 03/30/2021 01:40 PM

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

VICTORIA MAROULIS )
1010 W. 3rd Street )
Niles, OH 44446 )
)
       Plaintiff, )
)
    v. )
)
JK MOVING & STORAGE, INC. ) **COMPLAINT FOR DISABILITY**
d/b/a JK Moving Services and CapRelo ) **DISCRIMINATION, HOSTILE WORK**
44112 Mercure Circle ) **ENVIRONMENT, FMLA**
Sterling, VA 20166 ) **INTERFERENCE, FMLA**
) **RETALIATION, NEGLIGENT**
) **TRAINING, RETENTION &**
) **SUPERVISION**
)
) **JURY DEMAND ENDORSED HEREON**
)

Plaintiff Victoria Maroulis ("Plaintiff") alleges as follows for her Complaint against

Defendant JK Moving & Storage, Inc. d/b/a JK Moving Services and CapRelo ("Defendant"):

1. Plaintiff worked for Defendant in Trumbull County, Ohio.

2. Defendant is a foreign corporation, doing business in Trumbull County, Ohio.

3. Defendant is a national moving company.

4. Defendant was an employer of Plaintiff.

5. Defendant employed Andrea Bunch ("Bunch") as Vice President of Human

Resources.

6. Defendant employed Vincent Horan ("Horan") as Human Resources Manager.

7. Defendant employed Patti Keeler ("Keeler") as Chief Operating Officer.

8. Keeler supervised Plaintiff.



EXHIBIT
A

9. Plaintiff originally worked for a company called Conduent.

10. Defendant acquired Conduent on or about July 20, 2017.

11. Defendant employed Plaintiff as a Senior Team Lead from July 20, 2017 until March 17, 2021.

12. At all times during Plaintiff's employment with Defendant, Plaintiff worked remotely from her home address in Niles, Ohio and communicated with her coworkers by phone, email, and Skype or Microsoft Teams video conferencing.

13. The essential functions of Plaintiff's job as a Senior Team Lead included, but were not limited to, supervising a team of employees and managing a case load.

14. Plaintiff was qualified for her job.

15. Plaintiff had no written discipline during her employment with Defendant.

16. Defendant awarded Plaintiff with a perfect overall rating as an "A+ Player," for her 10/1/2017 through 3/31/2018 performance review.

17. Defendant awarded Plaintiff with a perfect overall rating as an "A+ Player," for her 4/1/2018 through 9/30/2018 performance review.

18. Defendant awarded Plaintiff with an excellent overall rating as an "A Player," for her 10/1/2018 through 3/31/2019 performance review.

19. Defendant awarded Plaintiff with an excellent overall rating as an "A Player," for her 4/1/2019 through 9/30/2019 performance review.

20. Defendant awarded Plaintiff with an excellent overall rating as an "A Player," for her 10/1/2019 through 3/31/2020 performance review.

21. Defendant awarded Plaintiff with an excellent overall rating as an "A Player," for her 4/1/2020 through 9/30/2020 performance review.

22. On December 11, 2020, Defendant awarded Plaintiff with an "It's My Job badge" in recognition of her excellent performance.

23. In or about November 2020, Plaintiff started menopause.

24. Plaintiff's menopause caused her to become disabled during her employment by Attention Deficit Hyperactivity Disorder Combined ("ADHD Combined").

25. The symptoms of ADHD Combined include, but are not limited to, racing thoughts, hyperactivity, rapid speech, and insomnia.

26. Plaintiff's impairment substantially limited one or more of her major life activities.

27. Defendant was aware of Plaintiff's disability.

28. Plaintiff has a record of impairment.

29. Defendant regarded Plaintiff as having an impairment.

30. Plaintiff could perform the essential functions of her job with or without a reasonable accommodation for her disability.

31. On or about January 18, 2021, a behavioral health facility called the Serenity Center of Youngstown diagnosed Plaintiff with ADHD Combined and prescribed her Adderall medication.

32. On January 19, 2021, Plaintiff emailed Keeler, "I finally met with a Dr. to officially help me with my forever racing brain lol.  I've never sought treatment for being so

3

hyper until it has affected my inability to sleep.  My OBGYN was correct, menopause has exasperated it.  So I'm officially diagnosed, per the Dr's words, with severe ADHD."

33. On January 25, 2021, Horan met with Plaintiff on Microsoft Teams.  During this meeting, Plaintiff disclosed her disability to Horan and explained that it would take her several weeks to adjust to the Adderall medication.  Horan and Plaintiff then discussed the Family Medical Leave Act ("FMLA").  Horan stated: "We'd like you to take FMLA leave.  Horan also harassed Plaintiff during this meeting by requiring her to submit to a drug test.

34. On January 25, 2021. Plaintiff submitted to a drug test.  One week later, the drug test showed that Plaintiff had taken Adderall medication.

35. On January 27, 2021, Plaintiff faxed Horan a "Certification of Health Care Provider for Employee's Serious Health Condition" form, pursuant to the FMLA.

36. Plaintiff took medical leave under the FMLA from January 25, 2021 until February 22, 2021.

37. On January 27, 2021, Plaintiff emailed Horan, "[T]he medication the Dr. gave me significantly improved my ADHD . . . .  It only worked for 3 hours, then the racing would start again.  At my appointment on Monday, they told me to take 2 a day and prescribed another kind, which finally calmed my brain way down.  I haven't slept more than 2-3 hours a night since end of October.  The lack of sleep was really making things worse . . . .  With the help of cognitive therapy and medication, I will be right as rain in good time."

38. On February 2, 2021, Plaintiff emailed the following reasonable accommodation request to Keeler: "My Dr. is preparing information for Vincent [Horan] with my permission, to disclose what ADHD looks like and how to help me succeed at work . . . .

4

I'm sharing this with you as my manager, to hopefully help you, help me to further succeed in the continued success of the organization."

39. Plaintiff returned to work after her FMLA leave on February 22, 2021.

40. Defendant did not reasonably accommodate Plaintiff's disability upon her return to work after her FMLA leave despite Plaintiff's written request for a reasonable accommodation on February 2nd.

41. Defendant made Plaintiff's job more difficult upon her return to work after her FMLA leave by denying Plaintiff access to her team and nitpicking Plaintiff's performance (which Bunch alleged were "chronic case file deficiencies").

42. Defendant failed to restore Plaintiff to the same or equivalent position upon her return to work after her FMLA leave by denying her access to her team as the Senior *Team* Lead. Specifically, Defendant blocked Plaintiff on Skype; then Keeler admonished Plaintiff for reaching out to her team members, ordered Plaintiff not to contact her team members anymore, and scheduled a meeting with Bunch for March 5th.

43. On March 2, 2021, Plaintiff emailed Keeler a Strength, Weaknesses, Opportunity & Threats ("SWOT") analysis from an ADHD coaching webinar that Plaintiff had attended online. Plaintiff emailed the SWOT analysis to Keeler to demonstrate some of the symptoms of ADHD that Plaintiff wished for Defendant to reasonably accommodate.

44. On March 5, 2021, Bunch and Keeler met with Plaintiff on Microsoft Teams. During this meeting, Plaintiff said, "My brain doesn't go as fast as it used to." Plaintiff also complained about disability discrimination and FMLA retaliation by stating that Defendant had treated Plaintiff "awkwardly" upon her return to work after her FMLA leave. Finally,

5

Plaintiff requested a reasonable accommodation for the second time by specifically asking Keeler to reduce her directions about case load management into writing so that Plaintiff could be more efficient at work despite her disability. In response, Bunch and Keeler ignored Plaintiff's second reasonable accommodation request by abruptly changing the subject. Bunch then launched into an outrageous tirade intended to both explicitly and implicitly malign, harass, threaten, and intimidate Plaintiff because of her disability and put her in fear of losing her job.

45. Bunch stated, "When you're at work, I don't want you to assume you're in a safe place with your personal condition."

46. Bunch stated, "There is no assumption you're protected."

47. Bunch stated, "We all know there's consequences of 'can't,'" referencing Plaintiff's ability to perform the essential functions of her job without a reasonable accommodation.

48. Bunch stated, "Due to your spiraling and very erratic behavior, I don't think we can discount the fact that many of the people you were interacting with were recoiling from you."

49. On March 13, 2021, Plaintiff emailed Bunch, Keeler, and Horan the following complaint about disability discrimination and requested a reasonable accommodation for the third time:

> As per our meeting on March 5th, I promised to take the time [to] reflect, analyze, and get back to you with any questions I may have.
>
> I would like to clarify the SWOT analysis I shared with Patti [Keeler] to discuss in our next [one on one meeting] was a standard **printout**

from an **ADHD coaching webinar** session I attended.  I was not prepared to have it forwarded to HR . . .  I hope you can understand my level of **confusion and concern on the purpose of the [March 5th] meeting we had.**

I am fully committed to ensuring I do my part to combat my diagnosis.  I've been informed by Doctors, it will never go away, and it is something that I will, for the rest of my life, always be prepared to struggle to defend myself to others who don't understand . . . .  **I only requested support** and understanding of the challenges I face with the stigma that comes with it . . . .

The sole purpose and intent [of sending Keeler the ADHD printout was] to discuss and ask **what I can do to help [Keeler] succeed in the managing of me** and some of the common struggles that plague an adult with my condition.  I did not expect that it would be shared, analyzed, and **paint a picture of me in a negative light** with HR and my supervisor . . . .

I was under the possible false impression from my physician, in our last session before returning to work, that she was **sending documentation to my employer to disclose my diagnosis and offer guidance on any accommodation that might be needed to support my continued success with the company** . . . .

I understand this communication alone opens me up for further scrutiny, possible **retaliation**, and hard feelings, but it is not my intent.  I just want to carry on with the business I was hired to do . . . .

I hope that as part of that focus, it includes company training efforts to support those members of society and colleagues that struggle with impairments that are not physically visible.

50. On March 17, 2021, Defendant terminated Plaintiff.

51. Plaintiff had eight weeks of medical leave available to her under the FMLA at the time Defendant terminated Plaintiff.

52. Defendant terminated Plaintiff because of her disability and in retaliation for her complaints about disability discrimination and for exercising her FMLA rights.

53. This Court has subject matter and personal jurisdiction over the claims raised in this Complaint.

54. Venue is proper in Trumbull County, Ohio.

55. Plaintiff has suffered damages in excess of $25,000.

56. Plaintiff has hired the undersigned counsel and has agreed to pay them reasonable attorney's fees and costs if they are successful on the claim set forth herein.

## COUNT I
## DISABILITY DISCRIMINATION/HOSTILE WORK ENVIRONMENT

57. Plaintiff re-alleges each allegation set forth in paragraphs 1 to 56 above.

58. In violation of Ohio Revised Code Sections 4112.02 and 4112.99, Defendant discriminated against Plaintiff because of her disability, because of her record of being disabled, or because of a perceived disability.

59. Plaintiff was qualified for her job.

60. Defendant discriminated against Plaintiff because of her disability.

61. Plaintiff was subjected to a hostile work environment by Defendant.

62. Plaintiff suffered an adverse employment action when Defendant terminated Plaintiff because of her disability, because of her record of being disabled, and because Defendant regarded Plaintiff as disabled.

63. Plaintiff has been damaged by Defendant's disability discrimination.

64. Defendant's conduct is the cause of Plaintiff's damages.

65. Defendant acted with actual malice, entitling Plaintiff to punitive damages and her attorney's fees and costs.

## COUNT II
## FMLA INTERFERENCE

66. Plaintiff re-alleges each allegation set forth in paragraphs 1 to 65 above.

67. In violation of the Family Medical Leave Act of 1993, 29 U.S.C. Section 2601, *et seq.*, Defendant interfered with Plaintiff's medical leave by not placing her in the same or equivalent position.

68. Plaintiff was entitled to take FMLA leave.

69. Plaintiff told Defendant that she intended to take FMLA leave.

70. Plaintiff was denied the benefits of medical leave under the FMLA when Defendant did not place Plaintiff into the same or equivalent position upon her return.

71. Plaintiff has been damaged by Defendant's interference.

72. Defendant's conduct is the cause of Plaintiff's damages.

73. Defendant acted willfully in violating the FMLA.

74. Plaintiff is entitled to liquidated damages and her attorney's fees and costs pursuant to the FMLA.

## COUNT III
## FMLA RETALIATION

75. Plaintiff re-alleges each allegation set forth in paragraphs 1 to 74 above.

76. In violation of the Family Medical Leave Act of 1993, 29 U.S.C. Section 2601, *et seq.*, Defendant retaliated against Plaintiff by terminating her employment because she took medical leave.

77. Plaintiff was engaged in FMLA protected activity by taking medical leave.

78. Defendant knew that Plaintiff was exercising FMLA rights by taking medical leave.

79. Plaintiff suffered an adverse employment action by being terminated by Defendant.

80. There is a causal connection between Plaintiff's FMLA protected activity and termination.

81. Plaintiff has been damaged by Defendant's retaliation.

82. Defendant's conduct is the cause of Plaintiff's damages.

83. Defendant acted willfully in violating the FMLA.

84. Plaintiff is entitled to liquidated damages and her attorney's fees and costs pursuant to the FMLA.

## COUNT IV
## NEGLIGENT TRAINING, RETENTION & SUPERVISION

85. Plaintiff re-alleges each allegation set forth in paragraphs 1 to 84 above.

86. Defendant had a duty to use due care in training, retaining, and supervising Bunch, Keeler, and Horan.

87. Defendant breached its duty to use due care in training, retaining, and supervising Bunch, Keeler, and Horan.

88. Plaintiff has been damaged by Defendant's failure to use due care.

89. Defendant's conduct is the cause of Plaintiff's damages.

WHEREFORE, Plaintiff demands judgment against Defendant for her lost wages, reinstatement or front pay, lost fringe benefits, liquidated damages, non-economic damages such

as emotional pain, suffering, inconvenience, physical anguish, and loss of enjoyment of life, any other compensatory damages, punitive damages, prejudgment interest at the statutory rate, post-judgment interest, attorney's fees and costs, and all other relief to which she is entitled.

JURY TRIAL DEMANDED.

Respectfully submitted,

/s/ Brad Levine
Stephan I. Voudris, Esq.
Supreme Court No. 0055795
Brad Levine, Esq.
Supreme Court No. 0090286
Voudris Law LLC
8401 Chagrin Road, Suite 8
Chagrin Falls, OH 44023
svoudris@voudrislaw.com
blevine@voudrislaw.com
440-543-0670
440-543-0721 (fax)
*Counsel for Plaintiff*